```
            IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF COLORADO
               CIVIL ACTION NO. _____
```

WENDY NHU-NGUYEN DUONG,
         PLAINTIFF,

V.

UNIVERSITY OF DENVER STURM COLLEGE OF LAW,
GREG KVIDTAD, PAUL CHAN, AND MARTIN KATZ,
                    DEFENDANTS.

_____

**COMPLAINT AND JURY DEMAND**
_____

## I. INTRODUCTION

1. This lawsuit is brought by Wendy (Nicole) Nhu-Nguyen Duong, Plaintiff, against the University of Denver ("University") Sturm College of Law, Defendant, hereinafter and sometimes referred to as College of Law ("College") and/or "Defendant institution" (collectively "the parties"). Plaintiff would show unto the Court as follows:

2. Plaintiff complains of

   (i) Defendants' breach of contract: violation of the confidentiality and non-disparagement clauses, and failure of specific performance with respect to the implementation of her severance/settlement agreement executed by the parties on July 21, 2010 ("Agreement"); and

   (ii) Defendants' retaliation in violation of Title VII of the Civil Rights Act of 1964 forbidding an employer from retaliating against an employee or past employee because of his/her opposition to any practice made

   unlawful by Title VII, 42 U.S.C. § 2000e-3(a) while he/she was employed by the Employer.

3. Although, upon information and belief, Defendants' breach and retaliation must have occurred in or about 2010, right after execution of the Agreement, Plaintiff only discovered and obtained proof of Defendants' contract breach and retaliatory act in or about March of 2020. Defendants' breach and retaliatory conduct have lasted for more than 10 years, without Plaintiff's actual knowledge prior to March of 2020.

4. This complaint thus constitutes, *inter alia*, the gist of Plaintiff 42 U.S.C S 1981 action.

## II. JURISDICTION AND VENUE

5. Jurisdiction vests under 28 U.S.C. section 1331 (federal question), 28 U.S.C. section 1343 (civil rights), 42 U.S.C. section 1981 (discrimination), and the contract law of the State of Colorado as state-law pendant jurisdiction.

6. The matters related to this action occurred in Denver County, Colorado, including the parties' entering into, and Defendants' breaching of, the contract of employment severance including the settlement of Plaintiff's tenure application, and all decisions associated with the same.

## III. PARTIES

7. Plaintiff, Wendy (Nicole) Nhu-Nguyen Duong, is an American citizen of Vietnamese descent.

8. Defendant, University of Denver Sturm College of Law, is a private law school located in Denver County, Colorado.

9. The individual defendants, Greg Kvistad, Paul Chan, and Martin Katz, are sued individually and in their official capacities as agents or representatives of the College, acting

on the matter of Plaintiff's employment in 2008-2011, and in the implementation of the Agreement in 2010-2011, and to date.

    a. Defendant Greg Kvidstad was Provost and supervisor of the Dean of the College of Law.

    b. Defendant Paul Chan was, and still is, general counsel, in charge of the negotiation and implementation of the Agreement in 2010-2011, and to date.

    c. Defendants Martin Katz was Dean of the College of Law at the time of, and was responsible for, the implementation of the Agreement in 2010-2011.

### IV. <u>STATEMENTS OF FACTS SUPPORTING CAUSES OF ACTION</u>

#### A. <u>Background</u>:

    10.  Plaintiff was employed by the University as a tenure-tracked Assistant Professor of Law, from 2002 (she was hired at the end of 2001) to May 2011. Plaintiff's full-time teaching duties at the College of Law began in the Fall of 2002.

    11.  Plaintiff has a broad and excellent educational background, including a B.S. degree in Journalism/Communication, with High Honors, from Southern Illinois University; a Juris Doctorate degree from the University of Houston Law Center, *cum laude*, Orders of the Barons, Order of the Coif; and an L.L.M. (post J.D.) degree from Harvard Law School, with straight A transcript and published thesis.

    12.  Plaintiff has been a licensed lawyer and a member of the Texas and D.C. bars in good standing(inactive status), and has been admitted to practice before the Southern District of Texas, Fifth Circuit Court of Appeals, D.C. Circuit and the United States Supreme Court (on inactive status).

    13.  Plaintiff's legal experience included clerking for the late Senior U. S. District Judge Hugh Gibson, Southern District

3

of Texas (1984-1986); serving as associate lawyer for Wilmer Cutler & Pickering, Washington, D.C. (1986-1988); Special Trial Attorney, Office of the General Counsel, U. S. Securities and Exchange Commission, Washington, D.C. (1988-1991); Senior Associate with Weil Gotshal & Manges, Houston, Texas (1991-1993); senior attorney for Baker & McKenzie (1993-1994); outside counsel and in-house counsel/Senior Legal Advisor serving Mobil Eastern Exploration & Development, Inc./Mobil Asia Pacific Pte. Ltd. (Singapore) as part of Mobil Corporation's Global Major Transactions Group (1993 (including period serving as outside counsel)-1997); Senior Counsel for Locke Liddell & Sapp, L.L.P., and Owner, Wendy Duong & Associates, Houston, Texas (1998-2002).

14. Plaintiff is fluent in both English and Vietnamese and has working knowledge of the French language.

15. Prior to and during her tenure track with the University, Plaintiff published substantially in various trade and scholarly publications, as well as with the literary press.

16. Plaintiff was recruited by the College of Law via the Association of American Law Schools (AALS), and came to the College after approximately 24 years of varied professional and legal experience (1978-2002).

17. In order to be hired, Plaintiff was extensively interviewed several times by various faculty members, and was required to make a presentation before the entire faculty and the Dean, demonstrating her eloquence, verbal communication skills and substantive knowledge of the law in her areas of expertise. She was also required to interact and talk with student representatives of the College during the recruitment and presentation processes.

18. Plaintiff is a fifth-generation teacher, a second-generation college professor, and a first-generation law professor in the United States.

19.     Plaintiff is the first-born daughter of a former British Council scholar and Fulbright Scholar (her father is a graduate of University of London in linguistics and holds a Ph.D. in Education Leadership from Southern Illinois University in the United States).

20. Upon information and belief, Plaintiff was, and still is, the first and only Vietnamese American law professor ever hired by Defendant institution.

21. From 2002 to 2010-2011, Plaintiff taught full-time at the College as a specialist in the law of corporations and business organizations (a bar-required course), and in International Business Transactions (a second- and third-year course).

22. Right at the onset of, and during the approximately 9 years of her employment at the College, Plaintiff experienced student misconduct, disruptive behaviors, and unreasonable student demands in her classrooms as well as in office conferences. These student behaviors also manifested themselves in the form of shrilling anonymous student evaluation comments reflecting race, national origin, gender, and disability biases, attacking her communication skills and teaching style as well as her comments on the law. These anonymous combative charges of teaching incompetence were posted online via University logistics and channels, despite other student comments complimenting Plaintiff's teaching expressly to the contrary.

23. The result was a "bipolar" student evaluation record over the years, ranging from highly complimentary to extreme hostility focusing on her communication and teaching (including those reflecting race, national origin, gender, and disability bias), although Plaintiff had come to legal academia after (i) 18 years of employment in some of the nation's most prestigious law firms serving corporations, (ii) her trial/prosecutorial

5

work with the federal government, (iii) her being selected as White House Fellowship regional finalist representing the Southwestern states, and (iv) her service for the City of Houston as a municipal judge and Texas magistrate (making her the first Vietnamese-American judge in the U.S., as honored by the American Bar Association, together with other female judges of color, at the ABA's "pioneer minority women in the judiciary" 1992 conference.

24. Plaintiff addressed these disturbing student classroom behaviors and comments with the Administration and senior faculty members. Nonetheless, the hostile, ugly, and illegal biased comments made by anonymous students remained displayed on Defendant's website from 2002 to the summer of 2009, when Law Dean Beto Juarez recommended Plaintiff's tenure, and did a preliminary redaction of improper comments before his resignation from the deanship in July 2009.

25. Upon information and belief, Dean Juarez's redaction, however, was limited only to the racist and sexist specific references, and comments containing four-letter words. The redaction did not correct the tainted nature of Plaintiff's classroom environment that persisted for the entirety of her tenure track, nor reflect the complete file and assessments depicting her teaching together with other supporting records. The hostile critical anonymous student comments were most prevalent during the time of Plaintiff's tenure review.

26. The College of Law's tenure process contemplated three reviews, which occurred during the second year, the fourth year, and the sixth year of Plaintiff's tenure track.

27. Plaintiff's tenure-tracked contract was renewed after the Second-Year Review.

28. Plaintiff's tenure-tracked contract was renewed after the Fourth-Year Review.

6

29. In her sixth academic year at the College, Plaintiff submitted her Tenure Application to the College.

30. The then Law Dean, Professor Beto Juarez, having carefully reviewed several tapes of Plaintiff's teaching, wrote a detailed report praising Plaintiff's teaching, and recommending tenure, prior to his resignation from the deanship.

31. Plaintiff also took her tenure file to the independent Faculty Review Committee ("FRC") consisting of ten University professors, including one representative from the law school, Professor Lucy Marsh, in accordance with established tenure review procedures applicable to Plaintiff's tenure application.

32. The FRC issued its report, concluding by "a vote of 9 to 1" that at the College, Professor Duong did not receive "adequate consideration" of her tenure and promotion application.

33. In this ambiance of Plaintiff's controversial student evaluation record containing improper biases, Plaintiff signed the Agreement, drafted and provided to Plaintiff by Defendants Paul Chan as General Counsel and Martin Katz as Dean of the College (succeeding former Dean Beto Juarez).

34. Under this Agreement, Plaintiff resigned from her professorship as of May 2011, to her detrimental reliance upon Defendant's agreement to implement and enforce:

(i) the specific performance provisions mandating sealing her student evaluation record in its entirety; and

(ii) the confidentiality and non-disparagement provisions;

(iii) Both (i) and (ii) are material covenant requirements constituting the essence of the executed Agreement that survive Plaintiff's resignation.

**B.   Causes of action for breach of contract:**

7

**1) Breach of confidentiality treatment and specific performance provisions regarding the sealing of confidential records in entirety**

35. Covenant II.M, on page 6 of the Agreement, states:

*Within 15 days after Employee's execution of the Agreement, the University shall perform the actions set forth in Tab D, incorporated herein…Those documents (and the content thereof) that are designated as confidential in Tab D shall not be distributed, circulated or otherwise disclosed by the University,…to any third party without a facially valid subpoena…in which event the University will provide timely notification to Employees sufficient to allow her to object or otherwise oppose such process. It is expressly agreed and understood by the parties that this confidentiality provision is an essential and material part of this Agreement* (emphasis added).

36. **Tab D** attached to the Agreement states:

*"Treatment of Confidential[] Information and Sealing of Records*

*"The University identifies…and agrees to treat the following information in the manner designated below.*

*"1) and 2) Student Evaluations*

*"…The University will remove Employee's on-line student evaluations and seal all of her evaluations kept in official University records in their entirety, including what is kept in the Registrar's Office. These evaluations shall be treated as confidential pursuant to the Settlement Agreement."* (emphasis added)

37. Covenant II.U states:

*"Both parties agree and acknowledge that all confidentiality and non-disparagement provisions of this Agreement are material and shall survive the resignation of Employee…"* (emphasis added)

38. Notwithstanding the very clear and affirmative language of the Covenants and Tab D quoted above, Defendants did not remove Plaintiff's on-line student evaluations records within 15

8

days from the Agreement's date of execution, as specifically required by the Agreement. Upon information and belief, such online evaluation record has remained displayed continuously since July 21, 2010 when the Agreement was executed.

39. Accordingly, the covenant incorporating Tab D's contractual obligation, as well as the covenant protecting confidentiality, were breached. Defendants failed to perform the contractual obligations required under the Covenants quoted above, and such breach has occurred, repeated, and remained continuously for more than 10 years until proof of breach was recently discovered by Plaintiff.

40. The continuous online posting of Plaintiff's student evaluation records designated as confidential by the Agreement is an impermissible disclosure of the protected data to third parties, i.e., the entire academic community and more than 10 years of disclosure to students and alumni, as well as any persons who were and are privy to the University's intranet code access, and who can then distribute the data further to others, resulting in irreparable harm to Plaintiff -- The ongoing posting defeats the purpose of confidentiality protection and portrays Plaintiff as an incompetent teacher. Plaintiff never received any prior notice from Defendant with respect to such disclosure and distribution, as prior notice is required by the Agreement.

**2) Disparagement:**

41) Covenant II.S on page 7 of the Agreement states:

*"The University agrees that its officials, employees and attorneys…will not at any time subsequent to the execution of this Agreement take an action…that discredits and disparages Employee."*

9

The online posting in violation of the Agreement's Tab D treatment is such "an action" that discredits and disparages Plaintiff, as it misleadingly portrays Plaintiff as an incompetent teacher, the very dispute that had led to the execution of the Agreement as binding covenants upon the parties.

42) Covenant II.5 on page 3 of the Agreement states:

*"Nothing in this Agreement shall constitute a waiver or release of any right of either party to enforce the terms of this Agreement…"*

43) Covenant II.T on page 7 of the Agreement states:

*"…Employee shall be able to explain factually…She shall be able to defend herself and her record if allegations about her character or competence or the circumstances of her employment with the University are made to third parties or in the public domain…in breach of this Agreement."*

44) The continuous online posting of Plaintiff's student evaluation records for more than 10 years is disparaging because of the following <u>eight</u> factors:

(i) The contractual covenant affirmatively mandates total removal of the entire record of Plaintiff's online student evaluations, not a redacted version. With the biased and ugly comments that could explain the context of the tainted and polemic classroom dynamics facing Plaintiff as a teacher having been redacted, the redacted posting no longer reveals the polluting effect of expressed biases upon teaching effectiveness, as such bias was circulated online, repeated in the classroom, semester after semester, year after year, thereby rendering the record no longer reliable as a measurement of the teacher's competence. The topic has been studied and discussed in scholarly articles and publications in legal academia and cultural studies.

(ii) For example, Professor Jeffrey Hartje, who chaired Plaintiff's tenure Advisory Committee, reported that he had

10

visited Plaintiff's Corporations class twice and had viewed nine of her International Business Transactions classes on tape. Professor Hartje defined student evaluation to be grossly imperfect tool in the assessment of teaching:

> *We have no objective measure of the ultimate goal – performance on the part of the student. The questions in our teaching evaluations are subject to multiple inferences as to their meaning and are inherently subjective.*
> *…*
> *While we may express understanding of the obstacles of gender, race, and language faced [by] our colleagues in the classroom, our response seems to be "cookie cutter," "one size fits all." We say, "Overcome it; be like us."*

(iii) Professor Hartje also cited the University's Teaching Task Force recommendation that the teaching evaluation modules be reexamined and redesigned to include a broad spectrum of performance measures that will fairly reflect the individual's contributions and achievements. "The sources of evidence used in the teaching evaluations should be reviewed for possible influence of such factors as **race [national origin**], gender, sexual orientation, religion, disability status and other social dimensions." (*emphasis added*).

(iv) although the continuous online postings do contain some positive comments from students who defended Plaintiff's teaching, the total record posted does not convey the complete data regarding Plaintiff's teaching assessments. Yet, after Plaintiff's resignation, the online posting becomes the only source of University-endorse record portraying Plaintiff as a teacher in a public-intranet domain that can serve as the point of circulation to others in the public. For example, the online posting did not convey the multi-sourced evidence of Plaintiff's teaching excellence, coming not only from external expert

11

reviewers but also from alumni who had been Plaintiff's students. Also writing in support of Plaintiff's teaching were several of Plaintiff's former students and distinguished alumni of the College, including those who graduated at the top of their classes, as well as business executives in the community. There were alumni who attributed their success in their career to Plaintiff. Others also referenced and described the racism directed at Plaintiff in her classrooms as witnessed by these alumni.

(v) In the further attempt to bring to the University's attention the disparate treatment accorded Plaintiff in the classroom, Professor Hartje cited Dean Frank Wu from Wayne State University who observed Plaintiff's taped classes and who reviewed her bipolar student evaluations. Dean Wu explained in his report:

> *I would not hesitate for a moment to say that her classroom performance is well within the norm to be expected of the profession. She may lecture more than some of her colleagues, but her presentation is in substance and style cogent and worthwhile … I would not have any doubts about her abilities in educat[ing] law students in her areas of expertise … From what I am able to discern, the student evaluations appear to reflect the unfortunate, perhaps unintentional tendency of individuals, despite the ideals of our diverse democracy, to be more critical of females and racial minorities, and especially women of color. I have done research on this topic, and I believe there is good empirical evidence for [that proposition] in a manner that would be appropriate to characterize as unfair. I would hesitate to place too much stock in teaching evaluations in a case such as this."*

(vi) Dean Wu's opinion was mirrored by other external reviewers of Plaintiff's teaching, including race and gender law expert and pedagogue Vernellia Randall of the University of

12

Dayton law school, Corporate Law Professor Richard Buxbaum of Berkeley Boalt Hall law school, former Law Dean of the University of Houston and Corporate Law Professor Nancy Rapoport of the University of Las Vegas, Dean Donald Polden of Santa Clara law school, and Dean Kelly Testy of the University of Washington law school.

(vii) Notwithstanding such clear and convincing evidence of Plaintiff's teaching excellence, the reviewing Policy Committee of the College objected to Plaintiff's teaching based on their view of her teaching via scanty, one-time, random observations of a classroom ambiance already tainted by years of bipolar, bias-diffused student evaluation record, on display to the entire student population, alumni, and the academic community (as well as others who received reports from the first-line recipients). Such view in effect stamped approval and concurrence on negative students' condemning Plaintiff's teaching in a classroom ambiance already polluted with bias, while paying little attention or disregarding the positive student comments and expert reviewers to the contrary.

(viii) The online continuous postings is also disparaging in assessing Plaintiff's teaching, because the negative student evaluations on display had two relevant drawbacks:

(a) while teaching is a composite process, much emphasis is drawn to and placed on only one type of activity -- perception of classroom instruction -- without considering the totality of classroom dynamics; and

b) evalwation evidence is restricted to student and limited College of Law peer ratings, which do not address the full range of attributes that are important to evaluating teaching effectiveness, particularly when the evaluative process has been

13

infected with unlawful biases or factors based on pre-determined lack of receptiveness that have everything to do with who and what the teacher is, not with the effectiveness of the teacher or methodology.

45. It was the foregoing reasons described in paragraphs 22-44 above that necessitated the specific performance provision of Covenant II.M and Tab D to seal Plaintiff's student evaluation record for the entirety of her tenure track, and not just selectively to create imbalance and semi-truths. These are the reasons why the specific performance provisions are contractually recognized as an essential and material part of the Agreement. The online posting presents a slanted, disparaging portrayal of Plaintiff's teaching. What happened in her classroom through the years foreshadowed the record, yet it was not told online as part of the ongoing display. Other assessments were not told in the 10-year only display. The redaction of biased and impermissible ugly comments made the online portrayal worse, because the redaction took away any possible explanation regarding the polluted and polemic classroom environment that has burdened the female professor of color.

C. **Retaliation in violation of Title VII and civil rights laws**

46. By drafting, proposing, and agreeing to the Covenants quoted in paragraphs 35-38 above as material, essential, and surviving Plaintiff's resignation, Defendants induced Plaintiff to enter into and execute the Agreement. Defendants' disregard of the plain language they drafted and proposed is so cavalier and reckless that it becomes incomprehensible and unjustifiable, demonstrating that Defendants did not treat those covenants as serious and material although making such promises as vital consideration for settling the dispute. Reasonableness questions

Defendants' intent to perform the specific performance provision regarding the online removal and sealing of Plaintiff's entire student evaluation record within 15 days of Agreement execution. The online posting since 2010-2011 (the execution timeframe for the Agreement) misleadingly serves to substantiate the view expressed by certain members of the faculty who opposed Plaintiff's teaching as the means to challenge Plaintiff's fitness for tenure and promotion.

47. Plaintiff took part in protected activity under Title VII when she filed charge 541-2009-00824 with the EEOC on or about December 11, 2008. Due to the Agreement, Plaintiff withdrew her EEOC charge effective October 25, 2010.

48. Defendants' blatant breach of the material and essential confidentiality and disparagement protective provisions constitutes retaliation inflicted upon a former employee past her date of resignation. Such retaliation penalized Plaintiff for having opposed the impermissible biases expressed in her classrooms and displayed online, taking the form and using the platform of anonymous evaluations enabled by Defendants.

49. As a resigning former faculty member, Plaintiff no long has access to the school's facilities and intranet in order to discover proof of Defendants' breach.

50. The on-line continuous posting of Plaintiff's student evaluation record in blatant violation of the Agreement confirms the misleading image of Plaintiff as an incompetent teacher, in defense of certain faculty oppositions to Plaintiff's teaching, thereby nullifying the protection of the Agreement. As such, the willful contract violation constituted unlawful retaliation against Plaintiff for having filed the Dec. 11, 2008 EEOC charge, i.e., taking part in a protected activity, seeking remedy for disparate treatment compared to other comparator-

tenure and promotion candidates on the faculty, and in opposition to discrimination and other impropriety in the workplace on account of her gender (female), her race (Asian), her national origin (Vietnamese), her age (then in her 50s), her color (brown/yellow), her religion (Catholic/Buddhist), her disability (age-related illness), as well as her academic freedom and the ability to maintain her independent thinking in legal academia and in a democracy.

## V.  **PRAYER FOR RELIEF**

51. Plaintiff prays for the following relief:

A.  Declaratory judgment that Defendants have committed breach of contract, and has engaged in unlawful retaliation in violation of Title VII and civil rights laws.

B.  Equitable and/or injunctive relief including an order abating the taint associated with illegal conduct.

C.  Compensatory damages incurred in the past, present and future;

D.  Punitive damages for willful disregard of Plaintiff's protected rights;

E. Reasonable and necessary attorney's fees incurred in the prosecution of this matter; attorney's fees are authorized, *inter alia*, under 42 U.S.C. section 1988;

F.  Pre-judgment and post-judgment interest;

G.  Costs of court.

H.  All other relief in equity and under law to which Plaintiff may be deemed entitled.

DATE: April 8, 2021          Respectfully submitted,

JURY TRIAL IS DEMANDED    e signature/Wendy Duong

 _____
 Wendy Duong, pro se
 3426 East Cedar Hollow Drive
 Pearland TX 77584; 713 436 6890;
 wduong2011@yahoo.com